UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEVE BURKE and JILL MISKELLEY,
as Co-Personal Representatives for the estate of
DANIEL TROJANOWSKI, deceased,

                                    Case No. 05-71873

        Plaintiff,

v.                                      District Judge George Caram Steeh
                                      Magistrate Judge R. Steven Whalen

HURON VALLEY CENTER,
ROSETTUS WEEKS, DIRECTOR;
DR. DILLON; JOHN G. CHUN, MD;
SANDRA LEWIS HILLS, RN;
M. WILLIAMS, LPN;
NURSE AGNES ANANYONDA, a/k/a NANNYONGA;
SEETHA VADLAMUNDI, MD;
DR. COMBALACER;
AND DR. DAVID GENDERNALIK, jointly and severally,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

     Before the Court is Defendant Nannyonga's[1] Motion to Dismiss [Docket #44] filed

on October 13, 2006, Defendant Nannyonga's Motion for Summary Disposition [Docket

#45] also filed October 13, 2006, and Defendants Weeks, Dillon, Vadlamudi, Chun,

Gendernalik, Combalecer, Hill, Williams and Huron Valley Center's Motion to Dismiss or

for Summary Judgment [Docket #47] filed on October 16, 2006,  which have been referred

---

[1]Incorrectly denominated as Ananyonda in the Complaint.

for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).[2]

For the reasons that follow, I recommend that the motion for dismissal by Defendant Nannyonga [Docket #44] be DENIED,[3] and her motion for summary disposition [Docket #45] GRANTED. I also recommend that the motion for summary judgment [Docket #47] be GRANTED as to Defendants Huron Valley Center, Rosettus Weeks, James Dillon, John G. Chun, Sandra Lewis Hills, M. Williams, Rafael Combalacer, and David Gendernalik, but DENIED as to Seetha Vadlamundi.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

On September 19, 2003, Lisa Burke filed suit as Personal Representative for the estate of Daniel Trojanowski, an inmate at the Huron Valley Center (Case no. 03-73607) alleging constitutional violations pursuant to 42 U.S.C.§§1983 and 1988 in the events surrounding Trojanowski's September 23, 1999 death. On March 24, 2005, the district court dismissed

_____

[2]Plaintiffs' response to the summary judgment motion concedes to the dismissal of Defendants Huron Valley Center, Rosettus Weeks, and Dr. Combalacer. *Docket #52* at 18. Therefore, the Court will not address arguments for dismissal of these Defendants.

[3]Defendant Nannyonga contends that dismissal is appropriate based on Plaintiffs' failure to serve the summons and complaint within 120 days of filing suit. Docket #44; Fed. R. Civ. P. 4(m). Dismissal on this basis should be denied. First, Nannyonga answered the Complaint on February 1, 2006 [Docket #31]. "Defendant consented to the jurisdiction of this Court by filing an answer to Plaintiff's complaint . . . waiving any objection to defective service of process." *Yarbrough v. Garrett,* 2007 WL 2049293, *3 (E.D.Mich. 2007)(Battani, J.). Second, this report recommends dismissal with prejudice on the merits of the claim against Nannyonga. *See Ajavon v. Ford Motor Co.,* 2007 WL 2109559, *2 (E.D.Mich.2007)(Borman, J.)("The Court declines to recommend dismissal under Fed.R.Civ.P. 4(m). Dismissal under that rule is without prejudice. The recommended dismissal [on the merits] therefore takes precedence over dismissal under that rule.").

the case without prejudice upon stipulation of all parties. Case no. 03-73607, Docket #58.
In 2005, a probate court appointed successor Personal Representatives Steve Burke and Jill
Miskelly. The successor Representatives, now Plaintiffs in the present action, filed suit on
May 11, 2005 pursuant to 42 U.S.C.§§1983 and 1988 against the Huron Valley Center and
various administrative and medical staff in their individual and official capacities.

The present Complaint contains the following factual allegations. Decedent, formerly
an inmate within the Michigan Department of Corrections, was referred to the Huron Valley
Center on November 20, 1998 after attempting to kill himself. On August 30, 1999,
Defendant David Gendernalik, M.D., Decedent's attending psychiatrist, prescribed once-
daily use of 250 milligrams of Sinequan, running until September 27, 1999.[4] *Complaint* at
¶22. On September 22, 1999, Defendant M. Williams, R.N., administered Decedent's last
dose of Sinequan. *Id*. at ¶23. On September 23, 1999 at approximately 12:15 a.m., Decedent
began experiencing severe respiratory problems. *Id*. at ¶24. Defendant Seetha Vadlamundi,
M.D., noting that Decedent experienced shortness of breath and expiratory wheezing,
administered an albuterol treatment, then transferred him back to the unit. *Id*. at ¶25-26.
Staff was notified that Decedent should be checked at 15-minute intervals. *Id.* at ¶33. At
5:17 a.m., after Decedent again complained of shortness of breath, staff gave him a proventil
inhaler. *Id*. at ¶34. At 10:10 a.m., Defendant Vadlamundi found that Decedent's asthma attack

---

[4]

PDRHealth.com indicates that Sinequan, otherwise known as Doxepin hydrochloride is used
to treat depression and anxiety. http://www.pdrhealth.com/drug_in
fo/rxdrugprofiles/drugs/sin1406.shtml.

was resolving, ordering an albuterol nebulizer treatment to be administered at 9:00 a.m. for the following five days. *Id.* at ¶35. Within the same hour, Decedent received one unit dose of albuterol after his symptoms failed to subside. *Id.* ¶36. 2:00 p.m. treating notes indicate that Decedent continued to experience trouble breathing. *Id.* at ¶37. At 4:00 p.m., Defendant Agnes Nannyonga, R.N. gave Decedent a proventil inhaler after he again complained of difficulty breathing. *Id.* at ¶38. At 4:20 p.m., Defendant Nannyonga called the on-call physician after observing Decedent wheezing and using his accessory muscles to breathe. *Id.* at ¶41. Ten minutes later, Nannyonga received an order to transport Decedent to the clinic for immediate albuterol nebulizer breathing treatment. *Id.* at ¶42. Defendant John G. Chun, M.D. requested an ambulance, and then, assisted by Defendants Nannyonga and Sandra Hills, R.N., attempted to to resuscitate Decedent. *Id.* at ¶¶46-47. Defendant Chun was also assisted by Defendant James Dillon, M.D. *Id.* at ¶52. Decedent was transported to St. Joseph Hospital where he was pronounced dead at 5:40 p.m. *Id.* at ¶53. An autopsy report found that death was caused by an overdose of Doxepin, taken earlier the same day at approximately 3:30 p.m. *Id.* at ¶54. Huron Valley Center records attributed death to a severe bronchial asthma attack followed by respiratory collapse and cardiac arrest *Id.* at ¶55. Plaintiffs allege that the Center, under the direction of Defendant Rosettus Weeks, failed to administer adequate medical attention which could have prevented the death. *Id.* at ¶¶56-57.

## II.   STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint "for failure of the pleading to state a claim upon which relief can be granted." In assessing a Rule 12(b)(6)

motion, the court accepts the plaintiff's factual allegations as true, and asks whether, as a matter of law, the plaintiff is entitled to legal relief. *Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir. 2001). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

## III.   ANALYSIS

### A.  Statute of Limitations

All Defendants, reiterating arguments for dismissal in the original case, contend that the first case, filed on September 19, 2003 based on a death occurring on September 23, 1999, is well beyond the three-year state statute of limitations applicable to personal injury actions. Defendants acknowledge the existence of a tolling provision under M.C.L. 600.5852 which allows the personal representative of the deceased person up to two years after receiving a Letter of Authority from the probate court, regardless of whether the statute of limitations has run. However, Defendants note that the original Personal Representative,

Lisa Burke, received a Letter of Authority on March 26, 2001, but did not file suit until September 19, 2003, almost six months after the statute of limitations had run.

M.C.L. 600.5805(10) states that "[t]he period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property." However, pursuant to M.C.L.600.5852, "an action which survives by law may be commenced by the personal representative of the deceased person at any time within 2 years after letters of authority are issued *although the period of limitations has run*. But an action shall not be brought under this provision unless the personal representative commences it within 3 years after the period of limitations has run." (Emphasis added). Defendants, figuring an expiration date for the present action, apparently contend that present Plaintiffs, Steve Burke and Jill Miskelley, are bound by the Letters of Authority issued to the original Plaintiff, Lisa Burke on March 26, 2001.

The present action commenced by the successor representatives is timely. *Eggleston v. Bio-Medical Applications of Detroit, Inc.*, 468 Mich. 29, 33, 658 N.W.2d 139, 142 (2003) states unequivocally that M.C.L.600.5852 does not intend for a *successor* personal representative to be bound to the original representative's issuance of the letters, holding that "the language adopted by the Legislature clearly allows an action to be brought within two years after letters of authority are issued to the [successor] personal representative." *Id.* The Letters of Authority were issued to present Plaintiffs in 2005.[5] Accordingly, the present

_____

[5]Plaintiffs response does not provide a specific date within 2005. Docket #52 at 18.

action's May 11, 2005 filing date falls easily within the parameters of §5852 and is therefore timely.[6]

## B. Eighth Amendment Claims

Defendants contend that dismissal is appropriate because the Complaint fails to describe the alleged wrongs committed with sufficient particularity, including the absence of an allegation indicating whether Decedent's death was attributable to suicide or asthma. Citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811(1994), Defendants argue that their medical judgments in the events leading up to the death did not rise to the level of deliberate indifference required to establish a constitutional violation and should not be "second guess[ed]" by the Courts. *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999)(*en banc*); *Farmer*; at 837, 1979.

The Supreme Court has held that Under the Eight Amendment, prisoners have a constitutional right to medical care. *Estelle v. Gamble,* 429 U.S. 97, 103; 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Prison officials may not act with deliberate indifference to the medical needs of their prisoners. *Id.* at 104. An Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2002). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently

---

[6]According to §5852, the Personal Representatives would have at most up to three years beyond the Statute of Limitation's expiration to file suit. Present Plaintiffs would be permitted to file suit up until September 23, 2005.

serious.'" *Id.* Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* Deliberate indifference may be established by showing an interruption of a prescribed plan of treatment, or a delay in medical treatment. *Id.*; *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).

Deliberate indifference to serious medical needs or a refusal to provide necessary care exists when objectively, the medical need at issue is sufficiently serious, and subjectively, the official perceived facts that showed a substantial risk to the prisoner, he drew such inference, and disregarded that risk. *Farmer, supra,* at 837; *Comstock, supra,* at 703. In other words, the subjective component is met when a prison official "consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839). Under the subjective standard, mere negligence or misdiagnosis of an ailment does not rise to the level of a constitutional violation. *Estelle,* 429 U.S. at 106; *Comstock,* 273 F.3d at 703.

**Individual Defendants[7]**

---

[7]

I note that an autopsy report, dated September 24, 1999 states that Decedent died of a self-inflicted "large overdose of doxepin [Sinequan]." *Docket #52* at Exhibit B. Conversely, Defendant Gendernalik, Decedent's treating psychiatrist at the time of his death, concluded that his patient "died as the result of an apparent attack of severe asthma with respiratory collapse and then cardiac arrest." *Id.*, Exhibit 1, at pg. 5 of 44. However, all parties agree (if on nothing else) that the conditions leading up Decedent's death occurred while he was under the care of Defendants.

### 1. David Gendernalik, M.D.

There is an absence of evidence to support the contention that Defendant Genernalik's actions or failure to act amounted to a constitutional violation. Assuming first that Decedent died of a large overdose of Sinequan, treatment notes indicate that Genernalik, Decedent's last attending psychiatrist, prescribed him large, but medically acceptable doses of the drug. PDRHealth.com indicates that the starting dose of Sinequan (Doxepin hydrochloride) for "mild to moderate illness is usually 75 milligrams per day," however, "[f]or more severe illness, gradually increased doses of up to 300 milligrams may be required as determined by your doctor.[8]" The record shows that Genernalik wrote a prescription for 250 milligrams of Sinequan to be taken daily from August 30, 1999 to September 27, 1999 after Decedent had received the same drug in gradually increasing amounts, starting with 50 milligrams in November, 1998 to 200 milligrams in January, 1999. *Docket # 52*, Exhibit A at 2 of 44; Docket #47, Exhibit 3, Gendernalik Deposition at 6.

Second, Decedent's treating notes in the days leading up to his death would not suggest to his treating psychiatrist that he was a suicide risk who required heightened care. Although Decedent acknowledged on September 16, 1999 that he "still had suicidal thoughts," progress notes also indicated that he was "becoming more talkative," socialized with his peers, and "continued to show improvement." *Docket #52*, Exhibit A at pg. 12-14 of 44. Staff took the additional precaution of administering a liquid, rather than tablet form

---

[8] http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/ sin1406.shtml.

of Sinequan to thwart possible attempts to hoard the drug for a suicide attempt in the days before his death. Although on September 21, 1999, Decedent requested a change of medication due to the fact that Sinequan made him "sleepwalk," he did not report or exhibit further ill effects from the drug. *Id.*, Exhibit 1 at 17-44.[9]

Last and most critically, Gendernalik testified that he last treated Decedent two full days before his death and had already left work when a "code" was called at approximately 4:30 p.m. on the day of Decedent's death . *Docket #47*, Exhibit 3, Gendernalik Deposition at 11-12. A reasonable trier of fact could not find that Gendernalik was deliberately indifferent to Decedent's medical needs, and could not find an Eighth Amendment violation.

In the absence of a constitutional violation, Defendant Genernalik is also entitled to summary judgment on the basis of qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6th Cir. 2002). Under *Saucier*, the threshold question is whether a constitutional violation occurred. If it did not, Defendant acting in the course of his official duties is protected by qualified immunity. Because the case is decided "under the first prong of *Saucier*'s two part

--------------------------------------

[9]

According to PRDHealth.com, symptoms of a Sinquan overdose include "[a]gitation, coma, confusion, convulsions, dilated pupils, disturbed concentration, drowsiness, hallucinations, high or low body temperature, irregular heartbeat, overactive reflexes, rigid muscles, severely low blood pressure, stupor, [and] vomiting." http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/sin1406.shtml. While Plaintiffs argue that Decedent experienced an irregular heartbeat in the last day before his death, the evidence does not suggest that Defendant Gendernalik was aware that Decedent experienced any ill effects from Sinquan other than the propensity to sleepwalk.

qualified immunity inquiry, we do not reach the second prong of that inquiry." *Dunigan v. Noble,* 390 F.3d 486, 495 (6th 2004).[10]

## 2. M. Williams

Likewise, Plaintiffs have not shown that M. Williams, R.N. was negligent, much less deliberately indifferent to Decedent's well being when administering 250 mg. of Sinquan the morning before Decedent's death. Plaintiffs, citing the medical examiner's finding that Decendent's died as a result of a Sinquan overdose (*Docket #52*, Exhibit B), allege that Williams consciously disregarded the health risks of giving Decedent "a dosage well above the prescribed amount." *Docket #52* at 17. As discussed *supra*, FN 7, the Sinequan dosage prescribed by Decedent's psychiatrist was on the higher end of an acceptable dose, rather than "well above" an appropriate level as alleged by Plaintiffs. Further, Decendent's medical records show that as recommended by PDRhealth, his former psychiatrist had initially prescribed 50 milligrams several months earlier before gradually increasing his dose.

To the extent that Plaintiffs' claim can be construed to fault Williams for neglecting to note possible symptoms of a Sinequan overdose, the only symptoms exhibited by

---

<sub>10</sub>

Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), a state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the Defendant's position would know that the conduct complained of was unlawful. In *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6th Cir. 2002), the Sixth Circuit set forth a three-part test to determine whether a government official is entitled to the defense of qualified immunity: (1) was there a violation of a constitutionally protected right; (2) was that right clearly established at the time; and (3) has the plaintiff alleged and shown by sufficient evidence that what the official allegedly did was objectively unreasonable?

Decedent which would suggest toxic levels of the drug were an elevated or irregular pulse.[11]

Given the fact that he had experienced shortness of breath and other symptoms of asthma

over the course of a few days, Williams would have more reasonably attributed his elevated

pulse to his long-term asthma. Notably, although Plaintiffs contend that Williams

consciously disregarded that Decedent's shortness of breath could be attributable a drug

overdose, "shortness of breath" is not listed among PDRhealth's 17 possible symptoms of

Sinequan toxicity. Faced with the absence of evidence establishing a constitutional violation

by Defendant Williams, she is further entitled to dismissal on the basis of qualified immunity.

*Dunigan, supra,* 390 F.3d at 495.

### 3. Agnes Nannyonga, R.N.

Defendant Nannyonga testified that she arrived at Decedent's unit at around 3:30 p.m.

on the day of his death. *Docket #52*, Exhibit E, Nannyonga Deposition at 15. She indicated

that Decedent informed her at approximately 4:00 p.m. that he was experiencing shortness

of breath. Id. After checking his vital signs and confirming a standing order for an inhaler,

she gave him "two puffs" of the Proventil inhaler. Id. at 16. She testified further that

Decedent continued to watch television, but indicated five to seven minutes later that he was

still experiencing breathing trouble. Id. She then contacted Defendant Chun, the doctor on

call that afternoon, who called her back "five to ten minutes" later, ordering her to bring

---

[11]On September 21, 1999 Decedent reported sleepwalking. *Docket #52*, Exhibit A at 17 of 44. To the extent that sleepwalking could be likened to "hallucinations," one of PDRhealth's signs of an overdose, "hallucinations" is only one of 17 possible symptoms attributable to Sinquan toxicity.

Decedent to the clinic for breathing treatment. *Id.* at 16-17. She testified further that she contacted "the command office to call Dr. Chun, I told them to call emergency, EMS." *Id.* at 24. Nannyonga stated that she next requested "more staff" from the area supervisor to help her place Decedent in a wheelchair, and "put on oxygen." *Id*. at 17. She reported she repeatedly took Decedent's vital signs while preparing him to be transported to the clinic, adding that she did not have access to a pulse oximeter at the clinic, but took Decedent's pulse ox rate upon arriving at the clinic. *Id.* at 20-21. She reported further that four staff members accompanied Decedent to the clinic. *Id.* at 17.

Admittedly, in reviewing the deposition accounts of the day's events leading up to Decedent's last moments, one is left with a sense of great frustration that with better coordination and a greater level of competence Decedent's life might have been spared. Most notably, although Nannyonga testified that she observed Decedent breathing with his accessory muscles (a sign of a deteriorating condition) she apparently did not include this critical piece of information when summarizing Decedent's condition to Defendant Chun (see below), which may have delayed the commencement of life-saving procedure for at least ten minutes before Defendant Chun called a medical emergency at 4:42 p.m.

However, claims against Nannyonga, although perhaps sufficient for a medical malpractice claim, do not rise to the level of deliberate indifference. A reasonable trier of fact could not find that she was "'deliberately indifferent to the serious medical needs" of Decedent to the point of that she "unnecessarily and wantonly inflict[ed] pain.'" *Perez v. Oakland County* 466 F.3d 416, *423 (6th Cir. 2006); *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th

Cir.1994).

While Nannyonga may have exhibited poor judgment and perhaps negligence, the record shows she was almost continually active in attempting to stabilize Decedent from the time he reported breathing problems shortly after 4:00 p.m. until EMS transported him to the hospital an hour later. No reasonable trier of fact could find Eighth Amendment deliberate indifference under these facts. In the absence of a constitutional violation, dismissal is warranted for Defendant Nannyonga.

### 4. John Chun, M.D.

Defendant Chun, the on call physician the afternoon of Decedent's death, testified that he received notification from Defendant Nannyonga at approximately 4:20 p.m. that Decedent was experiencing shortness of breath. *Docket #47*, Exhibit 6, Chun Deposition at 54. Chun testified that he "felt a little bit of urgency" in the nurse's report and therefore told to bring Decedent to the clinic immediately. *Id*. at Chun Deposition at pgs. 55-56. Reporting that Nannyonga did not inform him that Decedent was using his accessory muscles to breath, he indicated that if had observed a patient using accessory muscles, which he deemed "a worst case scenario," he would have called for an ambulance immediately. *Id.* at pgs. 57, 59. Chun testified that he was "waiting for him at the door" when Decedent arrived at the clinic by wheelchair. *Id.* at 60. Chun stated that he observed that Decedent, upon his arrival in the clinic, "looked bad but not as terrible as, I mean, somebody who going to die like a few hours later," but noted that within moments of placing Decedent on the examining table "he turned

blue." *Id.* at 67, 69. Chun reiterated that after placing Decedent on the examining table that he asked the nurse to check his O2 saturation, which she informed him was "only 66, and then that's like a few seconds, and then I turn around and look at the patient and he turned blue . . . I looked at the patient and he quit breathing at that moment, and immediately I told the nurse to call command Center to announce the code blue and ask for ambulance to send him out." *Id.* at 69. Defendant Chun then ordered other medical staff to administer two-man CPR. *Id.* at 70. Chest compression was also started. *Id.* at 81.

Plaintiffs alleges that the Decedent could have been saved if Defendant Chun had taken the one-minute trip to Decedent's unit, rather than ordering the nurse to bring the inmate to the clinic. *Docket #52* at 12. They allege further that Dr. Chun showed deliberate indifference by failing "to make any attempt to obtain an ACLS ambulance or oxygen or a crash cart" before Decedent's arrival at the clinic sometime between 4:30 and 4:40 p.m. which obliged a nurse to spend additional minutes retrieving "oxygen and [a] medical emergency drug box." *Id.* at 13-14.

Even accepting for the sake of argument that Plaintiffs can establish a causal connection between the critical delay resulting from Dr. Chun's decision to administer treatment at the clinic rather than at the unit and Decedent's death, the physician's decision does not rise to the level of a constitutional violation. Pursuant to *Farmer, supra,* 511 U.S. at 834, 114 S.Ct. 1979 and *Comstock v. McCrary,* 273 F.3d at 702, Plaintiffs have obviously established that Decedent's condition was "sufficiently serious." However, the record does not suggest that at the time Defendant Chun determined that examination at the clinic was

appropriate he was capable of inferring the gravity of Decedent's condition.

To start with, Defendant Chun testified that he was informed by telephone that Decedent was experiencing shortness of breath and that he had already received a nebulizer treatment. *Docket #47*, Exhibit 6, Chun Deposition at pg. 56. However, he indicated that Defendant Nannyonga failed to relate that Decedent's condition had deteriorated to the point where he was using his accessory muscles to breath, stating further that if he had been made aware of that ominous sign he would have called for an ambulance at once. *Id.* at 57, 59.

Chun, summarizing his reasoning at the time he was informed that Decedent was experiencing shortness of breath testified:

> "you know, when I received the phone call, the nurse describing about his current condition, and she was also talked about he received a breathing treatment earlier, so at that time, you know, I always told you and said I always said about thinking about the worst scenario, but at that time I also was thinking about the possibility of, you know, by giving additional treatment he may improve. That possibility is also there"

*Id*. at 74-75.

Further, assuming that Decedent's collapse and death was the result of a Sinequan overdose rather than asthma, Plaintiffs still cannot establish an Eighth Amendment violation. Even assuming that Chun neglected to familiarize himself with Decedent's medical history between the time he received Nannyonga's call and Decedent's arrival at the clinic, this at most might establish a claim of malpractice rather a constitutional violation. Nothing in the record suggests that Chun recognized the severity of the condition then disregarded it. Chun noted:

"[w]hen the nurse called me, she described about short of breath and difficulty in breathing and receiving a treatment earlier, but I did not know anything about his past history, what kind of medical condition he had, whether he was being – whether he – how long he had asthma problems and how long he has been treated for this particular episode, that kind of thing I have no idea. I did not have that information."

*Id.* at 74.

Plaintiffs further contend that treatment was delayed by the fact that Defendant Hills spent critical moments retrieving oxygen and a medical emergency drug box, alleging that Chun's failure to request such equipment earlier contributed to Decedent's death.[12] *Docket #47* at 14. However, again, Chun's initial failure to assess the gravity of Decedent's condition does not rise to the level of deliberate indifference. Plaintiffs do not dispute Chun's account that he waited for the Decedent's arrival "by the door of the clinic," or that within "moments" of a visible downturn in his patient's condition he called an ambulance and backup help from onsite medical staff. *Id.* at pgs. 60, 67, 69. Decedent's care, from approximately 4:20 p.m. to the time he was transported by ambulance to the hospital, was apparently hamstrung by the fact that Chun did not initially appreciate the seriousness of his condition when being contacted by Nannyonga. However, no one disputes that after properly assessing his patient's state upon arrival at the clinic, Chun's efforts were devoted exclusively saving Decedent's life. At no point did his actions amount to the "conscious

---

[12]Defendant Hills estimated that it took her approximately two minutes two retrieve the drug box and oxygen, later describing the distance from the equipment to the examining room as "kitty-corner across the hall." *Docket #47*, Exhibit F, Hills Deposition at 33, 38.

disregard" necessary to establish an Eighth Amendment claim.

### 5. Sandra Lewis-Hills, R.N. and James Dillon, M.D.

Defendants Hills and Dillon should be dismissed from this action based upon Plaintiffs' failure to state a claim against them. Allegations against Hills are encompassed in ¶46 of the Complaint, stating that "Defendant CHUN was assisted in CPR and ambu-bagging by Defendant HILLS and Defendant [Nannyonga]." Plaintiffs' Response to the present motion does not elaborate on Hills' alleged culpability, adding only that Defendant Chun's disregard for Decedent's health was "reflected in his lack of instruction to Nurse Hills." Docket #52 at 14. Moreover, Defendant Hills' deposition testimony does not provide a basis for concluding that her care of Decedent amounted to a constitutional violation. Hills testified that on September 23, 1999 she was working 3:00 to 11:00 p.m. shift when she received a call at approximately 4:40 p.m. from Dr. Chun asking her "to help somebody with a nebulizer treatment" *Docket #52*, Exhibit F, Hills Deposition at pgs. 5-6, 17, 22.

Hills testified that after crossing the hall from her office, she noted that Decedent's face, nail beds, and lips were turning blue. *Id.* at 24-25. She reported that she saw Defendant Nannyonga taking Decedent's pulse ox, indicating further that upon stepping into the room, Dr. Chun ordered Hills to "call a medical emergency." *Id.* at 27-28. Hills testified that she then ordered an ambulance and "requested that oxygen be brought" into Decedent's medical unit. *Id.* She then complied with Chun's order to start CPR before additional medical staff and security entered the room in response to the emergency call.

*Id.* at pg. 31. She then complied with Chun's request to bring oxygen and a medical emergency drug box into the examining room, adding that when she reentered the examining room, Decedent was surrounded by nurses and physicians *Id.* at pg. 32. Hills stated that at that point, she proceeded to fill out the paperwork needed to transport Decedent to the hospital, including his medical history, diet, and medications. *Id.* at pg. 37-38. In the absence of even the allegation of an Eighth Amendment violation by Hills, she should be dismissed.

Likewise, Defendant Dillon should be dismissed based on Plaintiffs' failure to state a claim against him. Dillon, a physician, is referenced only twice in the Complaint, first at ¶11 which alleges that Dillon was employed by the Center on September 23, 1999, and second, at ¶52 which indicates only that he assisted Defendant Chun during the medical emergency. Dillon testified in deposition that he "first became aware of Decedent on September 23, 1999 at approximately 4:45-4:50 p.m. after responding to an "overhead emergency call." *Docket #52*, Exhibit H, Dillon Deposition at pg. 26. Dillon testified further that he took Decedent's pulse, and noting that he "looked in extreme distress," started an IV. *Id.* at 28, 29. Dillon testified that he then infused epinephrine before a defibrillator was started. *Id.* at 32. Dillon also recalled that the IKG findings were "equivocal" as to whether "V Fib or "asystole," but opined that "the clinicians made the correct decision to go ahead and shock," allowing that although the patient may have been "asystole," shocking was appropriate because "the risks of shocking in asystole are

theoretical and relatively slight."[13] *Id*. at 32. Notably, Dillon testified five years later to the month that he had "a fairly vivid recall" of the afternoon's events *Id*. at 37. He reported further that after EMS arrived, he "joined the rest of the participants in the staff room" to "write reports" and "share a little bit of our grief." *Id*. at 36. In the absence of allegations stating a claim of a constitutional violation, Dillon should be dismissed.

### 6. Seetha Vadlamundi, M.D.

Plaintiffs allege that Vadlamundi's failure to transfer Decedent to the emergency room after Decedent began experiencing severe respiratory problems late in the evening of September 22, 1999 amounts to a constitutional violation. *Complaint* at ¶¶24-26; *Docket #52* at 10. Plaintiffs cite Vadlamundi's deposition testimony that after noting that Decedent experienced shortness of breath and expiratory wheezing characteristic of a moderate asthma attack, she administered an albuterol treatment and transferred him back to the unit rather than obtaining emergency treatment. *Complaint* at ¶¶24-26. Specifically, Plaintiffs' argument rests on the premise that Vadlamundi's failure to obtain emergency room treatment for Decedent, despite her recognition that his condition had reached a degree of severity requiring hospital care, and that her failure to secure appropriate treatment for Decedent in the last 18 hours before his death amounts to deliberate indifference under the

---

[13]Dillon, acknowledging that Decedent's autopsy showed a very high doxepin level also testified that "[t]he level itself may not be fully indicative of the level in life," stating that after death, the level "can go up." *Id.* at 40-41. He later acknowledged that he did not "know how the doxepin [Sinequan] relate[d] to the asthma attack." *Id*. at 59.

Eighth Amendment.[14]

   A genuine issue of material fact exists as to whether Vadlamundi consciously disregarded the seriousness of Decedent's condition. At a September, 2004 deposition, she classified asthma attacks in general as mild, moderate, and severe, stating that in the case of a "moderate" attack, she would send a patient to the emergency room. *Docket #52*, Exhibit D, Vadlamundi Deposition at 29. Later, she acknowledged that upon examining Decedent in the early hours of the day of his death, his vital signs were consistent with a "moderate" attack, admitting that instead of calling for emergency help, she administered a nebulizer treatment, then sent him back to his unit.[15] *Docket #52*, Exhibit D, Vadlamundi Deposition at 56-58.

   Additional evidence supports the contention that Vadlamundi was deliberately indifferent rather merely negligent in treating Decedent's condition. She acknowledged in her September, 2004 deposition that when a patient does not respond to a nebulizer treatment, he should be sent to the emergency room by ambulance. *Docket #52*, Exhibit D, Vadlamundi Deposition at 22-23. She testified that before administering a nebulizer

---

[14]
However, consistent with the testimony of other staff-members, Vadlamundi concluded her deposition by denying any knowledge of a "link between doxepin [Sinequan] and the onset of asthma." *Id*. at 85.

[15]In contrast to the deposition testimony of Drs. Chun and Dillon, Vadlamundi claimed that she had no recollection of treating Decedent the night before his death, but testified that she "came to the work the next morning and they told me he died." *Id*. at 36.

treatment, a patient's vital signs, along with a pulse ox reading should be obtained and that a critical indicator of a patient's improvement after a nebulizer treatment would be a pulse ox reading  *Id.* at 27-28, 76, 78.  However, she acknowledged that she administered the nebulizer at 12:15 a.m (admitting later that he showed symptoms of a moderate attack) without recording his pulse ox rate either before or after treatment.  *Id.* at 49-50.

Additional statements by Vadlamundi indicate that she consciously disregarded obvious signs that Decedent required emergency treatment in the hours before his death. [16] She acknowledged that one of the symptoms of a "moderate" attack would be that the "pulse ox is not picking up." *Id.* at 71.    However, a second nebulizer treatment, administered at 10:50 a.m. by a nurse per Vadlamundi's order, noted that Decedent's pulse ox rate remained the same before, during, and after treatment.  *Docket #52* at Exhibit A at pg. 21 of 44.   The same nurse noted that Decedent continued to experience "inspiratory and expiratory wheezing. . . in all lung fields."[17]  *Id.*

---

[16]*Compare McLain v. Secure Care, Inc.,* 2007 WL 1219048, *5 (E.D.Mich.2007)(Edmunds, J.)(Dismissal of a treating physician in a 1983 action stemming from the asthma death of a juvenile inmate on the basis that he reasonably believed that medication prescribed over a period of months was being administered to the decedent.)

[17]The Court is mindful that Decedent's self-assessments at times stand at odds with objective tests.   After nebulizer treatments at 12:15 and 10:50 a.m., Decedent reported improvement.  *Docket #52*, Exhibit A at 19-21 of 44.  Decedent even claimed that he was "Ok." at 4:00 p.m. - within minutes of his final collapse.  *Id.*  Clinical tests (like pulse ox) and medical protocol (referring "moderate" cases of asthma for emergency treatment) supercede a patient's subjective assessments of his condition.

Finally, there is a legitimate factual question as to whether Vadlamundi is protected by qualified immunity. Her position, rejected above, is that she is entitled to qualified immunity because there was no violation of Plaintiff's Eighth Amendment rights. Applying the paradigm of *Farmer v. Brennan* and *Comstock v. McCrary, supra*, Plaintiffs have met the objective component of an Eighth Amendment deliberate indifference claim by presenting evidence that Decedent had a sufficiently serious medical need which untreated by Vadlamundi, led to his death. Under the subjective component, Plaintiffs have presented evidence that she was actually aware of both the underlying medical condition and the substantial risk that it created, and that she disregarded that risk. "[D]eliberate indifference is the equivalent of 'criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm'" *Reeves v. Wallington* 2007 WL 1016979, \*6 (E.D.Mich. 2007); *Gibson v. Foltz,* 963 F.2d 851, 853 (6th Cir.1992). Record evidence supports the theory that Vadlamundi was well aware of the risks to Decedent at the time of his treatment. Further, the Eighth Amendment right was clearly established under *Farmer, supra*, and *Estelle, supra*. This is sufficient for Plaintiffs to avoid summary judgment on the question of qualified immunity.

## IV. CONCLUSION

For the reasons set forth above, I recommend that the motion for dismissal by Defendant Nannyonga [Docket #44] be DENIED, and her motion for summary disposition [Docket #45] GRANTED. I also recommend that the motion for summary judgment

[Docket #47] be GRANTED as to Defendants Huron Valley Center, Rosettus Weeks, James Dillon, John G. Chun, Sandra Lewis Hills, M. Williams, Rafael Combalacer, and David Gendernalik, but DENIED as to Seetha Vadlamundi.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue

contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 26, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 26, 2007.

s/Susan Jefferson
Case Manager